# UNITED STATES DISTRICT COURT
### for the
### Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
06/27/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
06/27/25
CENTRAL DISTRICT OF CALIFORNIA
BY: ___KC___ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) |
| SALVADOR ALEXIS ACOSTA-ROSALES, | ) Case No. 5:25-mj-00452 |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __June 25, 2025__ in the county of __San Bernardino__ in the __Central__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1326(a), and 18 U.S.C. § 659 | Illegal Alien Found in the United States Following Deportation; Theft from Interstate or Foreign Shipments |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

/s/
Complainant's signature

U.S. Border Patrol Agent, Darwin Anderson
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: June 27, 2025

Judge's signature

City and state: Riverside, CA

Honorable Sheri Pym, U.S. Magistrate Judge
Printed name and title

AUSA: Erin Kiss

## **AFFIDAVIT**

I, Darwin Anderson, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.  This affidavit is made in support of a criminal complaint against Salvador Alexis Acosta-Rosales ("ACOSTA-ROSALES") charging him with violating Title 18, United States Code, Section 659, Theft from Interstate or Foreign Shipments, and Title 8, United States Code, Section 1326(a), Illegal Alien Found in the United States Following Deportation (the "SUBJECT OFFENSES").

2.  Furthermore, this affidavit is made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECTS DEVICES"), as described in Attachment A, which were seized from ACOSTA-ROSALES on June 26, 2025, and are currently in the custody of United States Border Patrol, in Indio, California.

    a.  A gray Motorola Moto G phone retrieved from ACOSTA-ROSALES's front-left pocket bearing IMEI 356645504005176 ("SUBJECT DEVICE 1").

    b.  A black Google Pixel 9 Pro XL phone retrieved from ACOSTA-ROSALES's black satchel bag bearing IMEI 358361183126980 ("SUBJECT DEVICE 2").

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of the SUBJECTS OFFENSES as described more fully in Attachment

B.  Attachments A and B are incorporated herein by reference.

4.  I was not involved in the arrest of ACOSTA-ROSALES or their Mirandized interviews.  The facts set forth in this affidavit are based upon, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents.  This affidavit is intended to show that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically noted otherwise, all conversations and statements described herein are related in substance and in part only.

II.   **BACKGROUND OF BORDER PATROL AGENT DARWIN ANDERSON**

5.  I am a United States Border Patrol Agent ("BPA") with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP").  I have been employed as a full-time, sworn federal BPA with the USBP since August 21, 2016, and graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico.  The Academy curriculum covers specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21, United States Code, and in Title 19, United States Code.

III.   **STATEMENT OF PROBABLE CAUSE**

A. **BORDER PATROL IDENTIFIES SUSPICIOUS VEHICLE**

6.  On June 25, 2025, BPAs arrested ACOSTA-ROSALES for violations of the SUBJECT OFFENSES.

7. On this day, BPA Jaime-Molina was assigned to the Indio Disrupt Team ("IDT") on Interstate 40 ("I-40"). The IDT was targeting I-40 due to its strategic role in facilitating the transportation of illicit cargo across and throughout the United States. I-40 spans the United States from California to North Carolina and has earned a reputation as a "smugglers' highway." I-40 passes through major cities, rural areas, and areas that are less monitored by law enforcement. I-40 provides an ideal route for smugglers seeking to move illicit contraband such as narcotics, firearms, and human cargo. The highway's connections to key border states and access to numerous accessory roads make it a preferred choice for criminal networks attempting to evade law enforcement. The IDT unit has had many criminal seizures on I-40. BPA Jaime-Molina has been assigned to the IDT unit for over one year and has either initiated or assisted in over 70 encounters that pertained to the seizure or discovery of illicit narcotics, firearms, currency or human smuggling.

8. At approximately 9:30 p.m., on June 25, 2025, BPA Jaime-Molina was watching traffic on the westbound lanes of I-40. He was operating a marked Border Patrol vehicle equipped with lights and sirens. He was wearing a Border Patrol uniform with identifying insignia and a badge.

9. At this time, a silver Ford Explorer bearing California license plate ***415[1] passed his location. BPA Jaime-Molina recognized the Explorer from a previous encounter approximately three months prior. During that encounter, on

---

[1] The entire license plate is known to law enforcement but omitted from the affidavit for privacy concerns.

3

March 19, 2025, BPA Jaime-Molina attempted a vehicle stop on the Explorer. The Explorer fled from BPA Jaime-Molina, who then pursued the Explorer. The Explorer ultimately came to a stop and approximately five subjects exited and fled from the Explorer. The subjects were not located after fleeing. Agents on scene searched the Explorer and discovered a battery- powered saw, bolt cutters, a ski mask, and other items indicative of a train robbing operation.

10. On June 25, 2025, BPA Jaime-Molina ran record checks on the license plate which revealed an alert in a Department of Homeland Security Database. The alert indicated that the vehicle was possibly involved in a train robbery scheme on or about March 17, 2025. This alert further verified that the Explorer was the same vehicle encountered on March 19, 2025.

11. BPA Jaime-Molina pulled onto the highway, caught up to the Explorer, and remained about three car lengths behind. The Explorer was going approximately 70 mph in the left lane. Moments later, the Explorer merged to the right lane behind a tractor trailer and, slowed down to approximately 55 mph. Based on BPA Jaime-Molina's training, experience, and numerous recent apprehensions, he was aware that this driving behavior is exhibited by individuals involved in illicit activity to identify whether law enforcement is aware of their presence and to determine whether law enforcement is following them. By slowing down, the driver is allowing law enforcement to pass their vehicle. If law enforcement does not pass, it might confirm that they are being followed.

12. BPA Jaime-Molina remained behind the Explorer for approximately four miles. Once the Explorer passed the Fort Cady exit, near Daggett, California, it merged back to the left lane and increased its speed to approximately 70 mph and passed the tractor trailer. The Explorer then merged back to the right lane between two tractor trailers. BPA Jaime-Molina knows that this is another driving tactic used to try to evade law enforcement.

13. BPA Jaime-Molina merged to the left lane and increased his speed to drive parallel to the Explorer and see the occupants inside. As BPA Jaime-Molina began to drive parallel to the Explorer, the Explorer began to rock back and forth, indicating that it was braking. The Explorer then increased its speed. BPA Jaime-Molina could not identify any road conditions or hazards that would cause erratic speed changes. BPA Jaime-Molina was unable to clearly see the occupants due to the erratic driving. This is another common tactic used by subjects involved in criminal activity to not be identified by law enforcement.

14. BPA Jaime-Molina merged back behind the Explorer in the right lane and waited for a safer location to conduct a vehicle stop.

### B. ACOSTA-ROSALES FLEES FROM BORDER PATROL STOP

15. After traveling behind the Explorer for approximately ten miles, BPA Jaime-Molina activated his emergency lights and attempted to initiate a vehicle stop near the westbound Newberry Springs exit, located in San Bernardino County, California. The Explorer moved to the left lane and significantly increased its

speed to over 80 mph in an apparent attempt to flee. BPA Jaime-Molina then activated his vehicle's sirens along with the emergency lights and remained behind the Explorer for approximately five miles. After following the Explorer for approximately five miles, the Explorer merged to the right lane behind another tractor trailer and abruptly decreased its speed to match the tractor trailer. BPA Jaime-Molina presumed that the Explorer was slowing down to allow the occupants the ability to exit the vehicle and flee on foot or "bail out." The Explorer remained behind the tractor trailer for approximately two miles before exiting at Hidden Springs Road while simultaneously decreasing its speed. The Explorer stopped at the opening of the exit off-ramp at approximately 9:45 pm.

      16. Once the vehicle came to a stop, two occupants, later identified as David Arnulfo Saenz-Rosales ("Saenz") and ACOSTA-ROSALES, exited and ran from the Explorer. Saenz and ACOSTA-ROSALES ran northbound from I-40 into the open desert. BPA Jaime-Molina exited his vehicle and briefly visually inspected the interior of the Explorer to look for additional occupants. BPA Jaime-Molina saw multiple boxes in the trunk and rear seats of the Explorer containing Nike brand footwear. After BPA Jaime-Molina inspected the vehicle and did not find any additional occupants, he returned to his vehicle and drove to National Trails Highway Road to cut off Saenz and ACOSTA-ROSALES.

      17. At approximately 10:00 p.m., BPA Goodman found Saenz and ACOSTA-ROSALES approximately 200 yards south of the National Trails Highway Road attempting to hide. Other agents tracked

Saenz and ACOSTA-ROSALES's footprints from the Explorer to where they were found.

18.  BPA Ruiz conducted a brief immigration inspection on both Saenz and ACOSTA-ROSALES. Both subjects admitted to being in the United States illegally without any legal documentation. Saenz and ACOSTA-ROSALES were arrested and transported back to the Indio Border Patrol Station for further processing.  While at the Indio Border Patrol Station, on June 26, 2025, agents seized SUBJECT DEVICE 1 from ACOSTA-ROSALES's front-left pocket bearing and SUBJECT DEVICE 2 from ACOSTA-ROSALES's black satchel bag.  The SUBJECT DEVICES remain in the custody of United States Border Patrol, in Indio, California.

**C. STOLEN GOODS DISCOVERED IN THE EXPLORER**

19.  Agents returned the Explorer and discovered 104 new pairs of Nike Air Jordan Retro 4 shoes.  All but two pairs of shoes were in original packaging.

20.  Agents contacted BNSF Railway Assistant Chief of Police Ryan Lenhart who confirmed that the shoes were stolen from a BNSF Railway car on June 25, 2025, while the train was enroute to New Mexico. Assistant Chief Lenhart confirmed through Nike representatives that the shoes are not released to the public and will not be released until September 6, 2025, and that the Manufacture Suggested Retail Price is $216.00 per pair for a total of $22,464.00.

**D. ACOSTA-ROSALES WAS PREVIOUSLY REMOVED TO MEXICO**

21.  At the station, ACOSTA-ROSALES's biographical information and fingerprints were captured using E3 biometrics to

7

confirm ACOSTA-ROSALES's identity. This information revealed that ACOSTA-ROSALES had been issued an Alien Registration Number.[2] Using this information, on or about June 26, 2025, I reviewed the printouts of ICE computer indices on ACOSTA-ROSALES, which revealed that ACOSTA-ROSALES is a citizen of Mexico. Based on my training and experience, I know that the ICE computer indices track and document each time an alien is deported or excluded from the United States by ICE, was deported or excluded by the former INS, or is granted permission to enter or re-enter the United States. The ICE computer indices confirmed that ACOSTA-ROSALES had been ordered removed, deported, and/or excluded on June 6, 2023, and that ACOSTA-ROSALES was removed to Mexico on June 7, 2023. ICE Computer indices indicated that ACOSTA-ROSALES had again been ordered removed, deported, and/or excluded on October 24, 2024, and removed to Mexico on November 5, 2024. The ICE computer indices further indicated that ACOSTA-ROSALES had not applied for, or obtained from the Attorney General or the Secretary of Homeland Security, permission to re-enter the United States.

  E. ACOSTA-ROSALES'S INTERVIEW

     22. On June 26, 2025, at approximately 3:02 a.m., ACOSTA-ROSALES was advised of his <u>Miranda</u> rights. ACOSTA-ROSALES acknowledged his rights and made the following statement:

     23. ACOSTA-ROSALES crossed into the United States illegally and was removed most recently in November 2024.

     24. In February of 2025, ACOSTA-ROSALES entered the United

---

[2] The Alien Registration Number is known to law enforcement but omitted from the affidavit for privacy concerns.

States illegally from Nogales, Baja California, Mexico for a smuggling fee of $8,000.00.

25. On June 25, 2025, ACOSTA-ROSALES said he was approached by someone who he does not know very well who asked him if he wanted a quick job of picking up "product." When asked how he met this person, ACOSTA-ROSALES claimed through other acquaintances. ACOSTA-ROSALES claimed he did not know this person's name but knew him as "Yeyo." ACOSTA-ROSALES claimed that "Yeyo" gave him the Explorer to use.

26. ACOSTA-ROSALES claimed they left Lancaster at approximately 4:30 p.m. and traveled to an unknown location near Goffs, California. ACOSTA-ROSALES claimed when they arrived at the undisclosed location, two men began loading boxes into the Explorer. ACOSTA-ROSALES was asked where he was planing on taking the boxes to but claimed he did not know. ACOSTA-ROSALES claimed "Yeyo" was supposed to give him more instructions later via WhatsApp. ACOSTA-ROSALES claimed "Yeyo" was going to pay him somewhere between $400 and $500.

27. ACOSTA-ROSALES claimed he did not know where the boxes came from, but admitted it was possible they were taken from a train.

**F. PREVIEW OF SUBJECT DEVICE 1**

28. ACOSTA-ROSALES consented to the search of SUBJECT DEVICE 1, where agents discovered messages between ACOSTA-ROSALES and unknown individuals suggesting illicit involvement in train robberies. Additionally, in a video found on SUBJECT DEVICE 1, there is a video of a cargo train traveling, where the

9

subject recording the video appears to be attempting to conceal himself from a train employee traveling near the train.

### IV. TRAINING AND EXPERIENCE ON INTERSTATE THEFT

29. Based on my experience and training, I am familiar with the methods employed in interstate theft and contraband smuggling operations and the smuggling patterns employed by such organizations. I have also spoken with other experienced agents and other law enforcement officers about their experiences and the results of their investigations and interviews. I have become familiar with the methods of operation typically used by smugglers. Based on my training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

    a. Interstate theft and contraband smuggling is generally a continuing criminal activity taking place indefinitely unless interrupted by law enforcement action. Indeed, based on my training and experience, individuals who established an income based on smuggling tend to continue the activity for prolonged periods of time because that is how they make a living.

    b. Smugglers often use one or more telephones or other digital devices, sometimes in fictitious and/or other individuals' names, to communicate with other participants in their smuggling operations, including co-conspirators and customers, regarding matters such as price, arrival time, and meet location. This communication can occur by phone, text, email, or social media. Smugglers maintain in such devices

telephone and other contact information which reflects names, addresses, and/or telephone numbers of their associates in the smuggling organization, as well as customers of the smuggling business. Further, smugglers will also use text messages to send photographs as codes or actual pictures or videos. I know that the above-described information can be stored on digital devices carried by smugglers.

      c. Smugglers keep records of their illegal activities for a period of time extending beyond the time during which they actually transport a particular customer, in order to maintain contact with criminal associates for future smuggling operations, and to have records of prior transactions for which, for example, they might still be owed payment, or might owe someone else money

      d. Contraband smugglers frequently use Global Positioning System ("GPS") devices to navigate. I know that GPS devices often store route history information of previously travelled routes.

      e. Data contained on digital devices used by smugglers often include, among other things, records of telephone calls, text messages, email and social media communications between the smugglers and the co- conspirators; Global Positioning System ("GPS") information and other location information that can help identify embarkation and landing locations, meeting places, and smuggling routes; and identifying information about the smuggler and co-conspirators, such as contact lists, calendar appointments, and photographs or videos.

11

  f. Smugglers often possess multiple phones.

### V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

30. As used herein, the term "digital device" includes the SUBJECT DEVICES.

31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

  a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

  b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places

where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    32.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and

accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.    Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a

14

certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.   The person who was in possession of a device or had the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ACOSTA-ROSALES's thumb- and/or fingers on the SUBJECT DEVICES; and (2) hold the SUBJECT DEVICE in front of ACOSTA-ROSALES face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

34.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

35.   For all the reasons described above, there is probable cause to believe that ACOSTA-ROSALES has committed the SUBJECT OFFENSES.

///

///

36. Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES will be found on the SUBJECT DEVICES as described above and in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __27th__ day of June 2025.

_____
HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE